UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

FEB 08 2016

DOUGLAS F. YOUNG, Clerk
By _____ Deputy Clerk

| | | |
|---|---|---|
| MATTHEW DICKSON and JENNIFER DICKSON, individually and on behalf of all others similarly situated, | § § § § § | |
| PLAINTIFFS, | § § § | |
| v. | § § | CASE NO. 16-5027 PKH |
| GOSPEL FOR ASIA, INC., GOSPEL FOR ASIA-INTERNATIONAL, K.P. YOHANNAN, GISELA PUNNOSE, DANIEL PUNNOSE, DAVID CARROLL, and PAT EMERICK, | § § § § § § § § | |
| DEFENDANTS. | § § | |

## PLAINTIFFS' ORIGINAL CLASS ACTION COMPLAINT

Plaintiffs Matthew Dickson and Jennifer Dickson, individually and on behalf of a

Class of similarly situated donors, allege:

## I. PRELIMINARY STATEMENT

1.      Soliciting charitable donations to benefit the poorest of the poor while

covertly diverting the money to a multi-million dollar personal empire is reprehensible;

using a Christian organization as a front to attract and exploit the goodwill and generosity

of devout Christians is a particularly vile scheme. But that is exactly what K.P. Yohannan

and the organization he controls—Gospel for Asia, Inc.—have been getting away with

for years. Yohannan and a handful of close associates have acquired hundreds of millions

of dollars from tens of thousands of well-intentioned donors throughout the country; donors who send money they are told will be used for very specific charitable purposes, such as meals for impoverished, hungry children. In reality, Yohannan and his associates divert much of this money and do with it as they please, using it to buy and run for-profit businesses; to build an expensive, secluded headquarters and personal residences; to sponsor an international sports team; and to speculate in financial markets. This case is about ending this egregious abuse.

## II. JURISDICTION AND VENUE

2.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) because the Class consists of more than 100 members, the amount in controversy exceeds the sum or value of five million dollars ($5,000,000.00) exclusive of recoverable interest and costs, and minimal diversity exists. This Court also has subject matter jurisdiction pursuant to 18 U.S.C. § 1964, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the claims of Plaintiffs and the Class occurred in this District. Furthermore, venue is proper in this District because Plaintiffs sent donations to Gospel for Asia, Inc. from their home in Rogers, Arkansas.

## III. PARTIES

4.     Plaintiffs Matthew Dickson and Jennifer Dickson are individuals who are married and who reside in Rogers, Arkansas. Mr. and Mrs. Dickson bring this action

individually and as representatives of a Class of similarly situated donors.

5.      Defendant Gospel for Asia, Inc. (also known as "GFA" or "GFA-USA") is incorporated under the laws of Texas with its headquarters in Wills Point, Texas. The U.S. Internal Revenue Service currently recognizes GFA as both a 501(c)(3) non-profit entity and a "religious order." GFA also has at least fourteen known affiliated limited liability companies, all registered in Wills Point, TX, including "Road to Peace," "Unconditional Love," and "Bridge Builders." GFA has (or had) affiliated national offices in the United Kingdom, Germany, South Africa, Australia, India, South Korea, Finland, New Zealand, and Canada. Outside of the United States, GFA has its most significant presence in India, where it facilitates activities primarily through four entities: Believers Church, Gospel for Asia-India, Last Hour Ministries, and Love India Ministries. These four entities are each incorporated in the Indian State of Kerala. Believers Church is presented to be an Evangelical Christian religious organization that claims 2.6 million members, principally in South Asia. Believers Church owns and operates a number of for-profit outfits in India, including a rubber plantation, medical and engineering colleges, and a network of for-profit primary schools. GFA and Believers Church are closely linked through funding and purpose, and each is ultimately controlled by the same individual.

6.      Defendant Gospel for Asia-International (or "GFA-International") is incorporated under the laws of Texas with its headquarters in Wills Point, Texas. It was established as a joint venture of Defendant GFA and its Canadian and German affiliates.

7.      Defendant Yohannan Kadappiliaril Punnose (also known as "K.P." Yohannan) is an individual who resides in Wills Point, Texas. Yohannan founded GFA in 1978 and has continuously served as a member of its Board of Directors, its President,

and its International Director. Yohannan has travelled and spoken extensively, both within the United States and internationally, on behalf of GFA and is the recognized "face" of GFA throughout the world. Yohannan was also consecrated as the first Metropolitan[1] of Believers Church in 2003, under the authority of the Church of South India (part of the worldwide Anglican Communion). Yohannan has held the foregoing positions at all times relevant to this lawsuit and continues in such positions as of filing. In these positions, Yohannan is the central and principal actor in making the misrepresentations and engaging in the fraud described in this Complaint, as Yohannan directly controls or has ultimate authority over all aspects of GFA-USA, Gospel for Asia-International, Gospel for Asia-India, Believers Church, and all affiliated national offices of GFA. Yohannan has personal, direct access to finances of these entities, and, in his role as Metropolitan Bishop of Believers Church, all Church property is titled in Yohannan's name. All mailings and solicitations for all Gospel for Asia entities are sent out under Yohannan's name and signature.

    8.      Defendant Gisela Punnose (also known as Gisela Yohannan) is an individual who resides in Wills Point, Texas. She is married to K.P. Yohannan and is a member of the Board of Directors of GFA. Gisela Punnose has been involved with GFA since its inception and has represented GFA through appearances at Christian gatherings in multiple countries and through four well-known books.

    9.      Defendant Daniel Punnose is an individual who resides in Wills Point, Texas. He is the son of K.P. Yohannan and Gisela Punnose, is a member of the Board of Directors of GFA, and serves as its Vice President. Punnose has travelled and appeared

---

[1] A Metropolitan is the position of highest and absolute authority within the organization, analogous to the Pope of the Roman Catholic Church.

4

extensively worldwide on behalf of GFA, including frequent speaking appearances within the United States at conferences and churches.

10.     Defendant David Carroll is an individual who resides in Wills Point, Texas. Carroll serves GFA in multiple capacities, including Chief Financial Officer, and is also responsible for the overall operations of the U.S. Headquarters of GFA in Wills Point, Texas. Carroll has served with GFA since January 1992 and has since that time presented the work and vision of GFA to churches and ministries across the United States. Carroll has appeared on behalf of GFA in the media.

11.     Defendant Pat Emerick is an individual and a United States citizen who resides in Ontario, Canada. Emerick serves as the Director of the Canadian affiliate of GFA. Emerick is an ordained minister of Believers Church and has represented GFA on numerous speaking engagements in the United States and internationally.

12.     Defendants Gisela Punnose, Daniel Punnose, Carroll, Emerick, and GFA-International were aware of, and continue to be aware of, the misrepresentations and fraudulent acts committed by Defendants K.P. Yohannan and GFA. Defendants Gisela Punnose, Daniel Punnose, Carroll, Emerick, and GFA-International all provided material assistance to Defendants K.P. Yohannan and GFA in committing the acts and omissions set forth in this Complaint.

13.     Defendants are sometimes referred to collectively throughout this Complaint as "Defendants."

14.     Defendants conduct substantial business within Arkansas and throughout the United States through the solicitation and collection of monetary donations to GFA. Defendants have received donations through the "Arkansas to Asia with Love"

fundraising campaign that challenged Arkansas residents to donate to GFA.[2] Defendants

and/or their agents have also made personal appearances and presentations in Arkansas

designed to promote GFA and solicit and collect donations.

### IV. GENERAL ALLEGATIONS

15.     GFA is a global Christian missionary organization that operates in South

Asia, primarily within India. Through mail, radio, website, and in-person solicitations of

donations, GFA represents to potential donors that it funds indigenous community

development projects, provides desperately needed supplies and provisions to the poor,

and promotes a Christian message. Between 2007 and 2013, GFA has solicited over

$450,000,000 in donations from the United States alone, where the majority of GFA's

donors reside. Well over one million unique donations are made to GFA each year from

tens of thousands of donors who give one time or on a recurring, sponsorship basis.

However, despite repeated, explicit guarantees from GFA to donors, only a fraction of the

donated money supports the people and causes for which it was donated, as Defendants

redirect it for their own purposes. Significantly, the Evangelical Council for Financial

Accountability ("ECFA"), a private oversight body that reviews the finances of Christian

organizations that solicit charitable donations, decertified GFA in September of 2015

after investigating its finances. *See generally* Exhibit 1 hereto.

---

[2] *See* https://www.mygfa.org/arkansastoasiawithlove/#donations (last accessed January 28, 2016).  Similar campaigns have been conducted in other states.

**A.     GFA solicits money by promising to use 100% of it for donor-specified purposes in the mission field**

16.     GFA solicits donations through its website (www.GFA.org), mailed solicitations, radio programming, and at in-person presentations. In its solicitations, GFA relies on three main types of representations: (1) its "GFA 100% Guarantee" that all money donated "goes to the field" when the donor intends; (2) a purportedly urgent, critical need for immediate donations; and (3) the donor's ability to designate particular projects or items and GFA's commitment to honor the donor's designations.

17.     GFA claims consistently that "100%" of what a donor gives for development, relief, and sponsorship abroad will go "to the field." GFA claims that the GFA 100% Guarantee "has been our practice from the beginning," and it places red, stamp-like emblems boasting "100% Guarantee" throughout GFA solicitations, as illustrated in the following examples:

# Financial Integrity

Gospel for Asia is firmly committed to good stewardship of the funds entrusted to us by our friends and donors. We promise to use your gifts wisely and effectively in Christ's name.

100% of what you give toward sponsorship goes to the field. This has been our practice from the beginning. Find out how.



*The 100% Guarantee appears throughout GFA's website (as of September 3, 2015). See*
*https://web.archive.org/web/20150906012157/http://www.gfa.org/about/financial-*
*integrity/,[3] last accessed February 2, 2016.*

---

[3] Prior versions of GFA webpages citing "web.archive.org" are viewable today at the Internet Archive's "Wayback Machine," self-described as a "service that allows people to visit archived versions of Web sites. Visitors to the Wayback Machine can type in a URL, select a date range, and then begin surfing on an archived version of the Web." *See* https://archive.org/about/faqs.php#The_Wayback_Machine, last accessed February 2, 2016.



*The 100% Guarantee appears repeatedly in GFA's printed 2015 "Christmas Catalog." Exhibit 2 hereto.*

18.     As GFA explains on its website, "the Field" for which GFA solicits charitable relief is a geographic concept, meaning the "10/40 Window" (the section of the Eastern Hemisphere between 10 and 40 degrees north of the Equator; the countries in this region face high levels of socioeconomic challenge and have low access to Christian theology).[4] The 10/40 Window (and, thus, "the Field") contains over 50 countries, not including the United States. GFA-USA is termed the "Home Office," such that the 100% Guarantee explicitly states that donations for "the Field" will never be applied for projects or needs within the United States, including GFA's administrative or salary expenses.[5]

19.     Additionally, GFA further tells donors that the need for funding is "urgent"

---

[4] *See* http://www.gfa.org/about/what-we-do/ (last accessed February 1, 2016).
[5] *See* "I've read in many of your publications that 100% of the money I give for mission work goes directly to the field. How does GFA raise enough money for administrative needs?" and "How are GFA home team staff supported" on FAQs at http://www.gfa.org/about/faqs/ (last accessed February 1, 2016).

to enable "critical" and "emergency" projects.[6] Missionaries "have the opportunity to change lives in Asia, but only for a short time"; they "just need your help" to begin their fellowships among the unreached in Asia.[7] Hundreds of children are "awaiting" donations to begin "today" for schooling, clothing, and care.[8] This sense of urgency is intended to compel donors to act sooner and more often than they might otherwise, as illustrated in the following examples:



*A GFA "Emergency Gram" the Dicksons received in May 2015. Exhibit 3 hereto.*

---

[6] *See* Exhibit 1 hereto at p.3, item 4 ("The level of urgency communicated in GFA donor appeals contrasted with reserves held by foreign field partners and delays in sending funding to the field.").

[7] *See* http://www.gfa.org/sponsor/ and http://www.gfa.org/sponsor/why-national-missionaries/, respectively (last accessed February 1, 2016).

[8] *See* http://www.gfa.org/sponsorachild/filter/ (last accessed February 1, 2016).

### 997 children awaiting sponsorship

Many of the 74,000 children in our Bridge of Hope program are waiting for permanent sponsors. Your sponsorship today will help us provide for them.

 **One hundred percent** of what you give for sponsorship goes to the field. Nothing is taken out for administrative expenses.

*A solicitation for child sponsorship on the GFA website (as of September 3, 2015). See*
*https://web.archive.org/web/20150906032451/http://www.gfa.org/sponsorachild/filter/*
*(last accessed February 2, 2016).*

20.     Crucially, GFA promises, through mail solicitations and its website, to apply donations only to the specific projects and items donors select. GFA sends out monthly direct mail "campaign" solicitations, often tied to specific projects or items, such as its "Sewing Machines Appeal" from April 2012 or the "Pure Water Appeal" from August 2014, as well as occasional "Harvest" Newsletters and the "GFA World" magazine, each of which solicit donations. The best example of GFA's mail solicitation effort is the "GFA Christmas Catalog," an annual 15-20 page glossy with photos of specific "gifts" that donors may provide to the needy to coincide with the holiday season. Exhibit 2 hereto. Like the GFA Christmas Catalog, the GFA website (www.GFA.org) lists dozens of items and services to support relief work and directly improve lives. For example, GFA represents that a $12 donation will be applied toward the purchase of a blanket for a family in need of warmth:

10



*Solicitation of blankets for the needy in the 2015 "GFA Christmas Catalog." Exhibit 2 hereto.*



*Solicitation of blankets for the needy on GFA.org. See http://www.gfa.org/donation/browse/items/joy-of-work/ (last accessed February 1, 2016).*

21.    GFA represents that a $345 donation will be applied toward the purchase of a camel to facilitate commerce and provide food and clothing:



*Solicitation of camels for the needy in the 2015 "GFA Christmas Catalog." Exhibit 2 hereto.*



*Solicitation of camels for the needy on GFA.org. See http://www.gfa.org/donation/browse/items/from-the-stable/ (last accessed February 1, 2016).*

22.     GFA represents that a $1,200 donation will be applied toward the purchase of a missionary's motorcycle to facilitate a missionary's outreach:



*Solicitation of motorcycles for missionaries in the 2015 "GFA Christmas Catalog." Exhibit 2 hereto.*



*Solicitation of motorbikes for the missionaries on GFA.org. See http://www.gfa.org/donation/browse/items/tools-for-missionaries/ (last accessed February 2, 2016).*

23.     GFA also offers a specific donation option for the "Home Team" to defray costs of GFA's U.S. administration and staff salaries. This option would, if realized, give effect to GFA's claimed distinction between donations "to the Field" and for the "Home Team" and the applicability of the GFA 100% Guarantee to the former:



*Solicitation for Home Team support on GFA.org. See*
*http://www.gfa.org/donation/browse/items/where-most-needed/ (last accessed February 1,*
*2016).*



*Solicitation specific to "the Field" in the 2015 "GFA Christmas Catalog." Exhibit 2*
*hereto.*

24.    Once the donor has selected the items she wishes to provide, she either copies each item's designation code to a pledge card or, through the website, adds the item to her "cart," no different from the experience of shopping with a major retailer. She receives a donation receipt from GFA expressing gratitude for the gift and indicating the specific amounts designated for each specific project or item (including the designation code on the receipt), often repeating the "GFA 100% Guarantee," as shown in the following example:



*An example receipt GFA sent the Dicksons; note documentation of donor's designations as "Commitments" by name and GFA's designation code. The 100% Guarantee is at the bottom of this receipt (Exhibit 4 hereto).*

25.     In addition to providing a portal for donations, GFA's website is a repository for promotional and explanatory materials and GFA's policy documents. The website answers frequently asked questions, and offers descriptions of "Who We Are"[9] and ways for the faithful to "Pray"[10] for GFA, among other topics. This information is readily available to donors who visit the website (which is also referenced in nearly all mail solicitations).

26.     In mid-September of 2015, GFA updated the "Financial Integrity" section of its website to reflect its loss of membership in ECFA. At this time, GFA also altered its explanation of the 100% Guarantee, the hallmark pledge it had made to donors "since the beginning of the ministry." The initial boast of the 100% Guarantee remained exactly the same after the mid-September 2015 alterations:

---

[9] *See* http://www.gfa.org/about/who-we-are/ (last accessed February 1, 2016).
[10] *See* http://www.gfa.org/pray/ (last accessed February 1, 2016).



*The initial presentation of the 100% Guarantee in the "Financial Integrity" section of GFA's website (as of September 3, 2015).*
*See https://web.archive.org/web/20150906012157/http://www.gfa.org/about/financial-integrity/ (last accessed February 2, 2016).*



*The exact same initial presentation of the 100% Guarantee in the "Financial Integrity" section of GFA's current website. See http://www.gfa.org/about/financial-integrity/ (last accessed February 1, 2016).*

27.     But GFA revised its explanation of the 100% Guarantee by adding the

following wholly new verbiage: "We are committed to honoring your gift preferences,

however, occasionally we receive more contributions for a given project than can be

wisely applied to that project. When this happens we use the funds to meet a similar

pressing need." The following two screenshots from GFA's website illustrate the change:

> ## 100% to the Field
>
> Since the ministry began, we have sent 100% percent of what you give toward sponsoring a missionary or child to the field.
>
> One hundred percent of contributions for use on the mission field are sent to the nations we serve and we have trusted the Lord to provide for our overhead costs.
>
> At the same time, we do our part to keep these expenses very low. For instance, our home office staff members raise their own financial support, which covers their salary and benefits, helping keep our overhead costs at a minimum.
>
> Our administrative costs are covered through donations designated "Home Office" or sometimes "Where Most Needed". The Lord has been faithful to meet our every need for over 30 years, and we give Him glory and thanks.

*The explanation of the 100% Guarantee in the "Financial Integrity" section of GFA's website (as of September 3, 2015). See https://web.archive.org/web/20150906012157/http://www.gfa.org/about/financial-integrity/ (last accessed February 2, 2016).*

> ## 100% to the Field
>
> 100% of all donations preferenced for use on the mission field are sent to the mission field. Contributions are income tax deductible to the extent allowed by law, and are made with the understanding that Gospel for Asia has complete discretion and control over the use of all donated funds. We are committed to honoring your gift preferences, however, occasionally we receive more contributions for a given project than can be wisely applied to that project. When this happens we use the funds to meet a similar pressing need.

*The revised explanation of the 100% Guarantee in the "Financial Integrity" section of GFA's current website. See http://www.gfa.org/about/financial-integrity/ (last accessed February 1, 2016).*

**B.    After it receives money, GFA diverts and misdirects the majority of it**

28.    GFA claims to be a 501(c)(3) non-profit entity and a "religious order" recognized by the Internal Revenue Service (under IRS Rev. Proc. 91-20, 1991-1 C.B.

524, Sec. 3),[11] and it therefore is not required to publish its financial statements (IRS

Form 990) as is otherwise required of a 501(c)(3). In India, however, as a foreign charity,

GFA is required to publicly account for all funds it spends in the country, pursuant to the

Indian Foreign Contribution Regulation Act of 2010. Financial analysis of the reports

submitted to the Indian Government ("FC-6 forms") for Believers Church, Gospel for

Asia-India, and the related limited liability companies Last Hour Ministries and Love

India Ministries demonstrates just how little of the money GFA sends to India is actually

spent on the projects and items U.S. donors designated. *See generally* Exhibits 1, 5, and 6

hereto.

      29.    For example, in 2013 (the most recent year for which audited financial

data is available), GFA worldwide collected around $115,000,000 in donations (more

than $90 million from the U.S.), but spent only $14,644,642 on services and relief under

GFA's mission to support the poor and needy of India—directly contrary to donor

designations and GFA's promises. Here is an overview of what GFA did with donated

money in 2013 (as an example of its practices), derived from internal GFA financial

documents and FC-6 forms:

- GFA's national offices in the United States, Canada, the United Kingdom,

    Australia, New Zealand, and Germany dispersed a total of approximately $118.6

    million in the fiscal year ending December 31, 2013.[12] Of this $118.6 million:

---

[11] See http://www.gfa.org/sponsor/search/ and "I hear GFA is a religious order. What does that mean?" answered at http://www.gfa.org/about/faqs/, last accessed February 1, 2016.

[12] Rounding and currency conversions may account for slight variations in totals presented, but tabulations of exact figures based on GFA's internal and/or audited amounts and official Indian public records GFA affiliates provided to the Indian Government pursuant to Indian law are attached as Exhibits 5 and 6 hereto.

- o $37.8 million was spent on the administrative needs of the various national offices (GFA spent $24.3 million of this on the continuing construction of GFA's headquarters in Wills Point).

- o $76.3 million was provided to Gospel for Asia-International ($58,482,900 from GFA-USA; $11.4 million from GFA-Canada; and $1 million from GFA-Germany).

- o GFA-UK, GFA-New Zealand, and GFA-Australia sent a combined $5.3 million directly to GFA affiliates in India (as reflected on FC-6 forms).

- Of the $76.3 million GFA-International received from GFA entities in the United States, Canada, and Germany, almost $43 million went missing, no longer accounted for in GFA financial documents nor received in India per FC-6 forms.

- The four Indian-based GFA affiliates (GFA-India, Believers Church, Love India Ministries, and Last Hour Ministries) declared receipt of $33.6 million from foreign sources. Just $28.3 million was declared to have come from the U.S., Canada, and Germany through GFA-International; the United Kingdom, Australia, and New Zealand had sent the balance directly to these GFA affiliates.

- o To this received total of $33.6 million, the four Indian-based GFA affiliates added an existing bank balance of more than $170 million and annual interest earned of more than $14 million. This provided these four GFA-affiliates with more than $215 million available to spend.

- o However, of this $215 million cash-on-hand, almost $15 million would depreciate due to currency fluctuations and the GFA affiliates closed the year with almost $150 million still in their bank accounts. This left the

four GFA affiliates 2013 spending total at $54.5 million, as reflected

through the combined FC-6 forms.

o   Of this $54.5 million total:

- $9.2 million was spent on Field administrative expenses.

- $14.7 million was spent on the purchase and/or construction of the

  for-profit Believers Church Hospital.

- $15.7 million was spent on Believers Church salaries and overhead.

o   **Only $14.9 million was spent on all direct relief to the poor and needy
    of India.** This included (as described on Indian FC-6 forms) just:

- $6.3 million on "welfare of children" (also known as

  GFA's "Bridge of Hope");

- $5.8 million on "religious schools/education of priests and

  preachers" (also known as GFA's "National Missionaries"

  sponsorships);

- $1.4 million on "digging of bore wells" (also known as

  GFA's "Jesus Wells");

- $0.5 million on "relief/rehabilitation of victims of natural

  calamities" (also known as GFA's "disaster relief" fund);

  and

- $436.00 on "welfare of the aged/widows" and $0.00

  "welfare of the orphans" (also known as GFA's "Widows

  and Orphans" fund).

30.     Thus, despite GFA's explicit representations that it would spend in the

field 100% of every dollar donors designated for the field, GFA spent only $14.9 million of $118.6 million on actual relief efforts, instead spending far more on salaries and overhead for Believers Church and construction of the GFA Headquarters in Wills Point, Texas. The following three examples further illustrate particular ways in which GFA misdirected funds designated by donors for specific purposes:

### 1.    GFA misdirected money designated for Bridge of Hope

31.    GFA advertises that through its "Bridge of Hope" program it will provide a child in India with "Jesus' love; quality education; a daily meal; and medical care" in exchange for a monthly pledge of $35.[13] Bridge of Hope is one of GFA's most popular donation options, receiving millions of dollars annually from tens of thousands of donors in the United States, many of whom sponsor multiple children over multiple years:



*Bridge of Hope sponsorship information from GFA's website (as of September 3, 2015). See https://web.archive.org/web/20150906032451/http://www.gfa.org/sponsorachild/filter/ (last accessed February 2, 2016).*

32.    However, per GFA documents, in FYE 2014 the actual cost to support a

---

[13] *See* http://www.gfa.org/sponsorachild/filter/ (last accessed February 1, 2016).

child in Bridge of Hope was less than INR 500 (roughly $8.20) per month.[14] In 2013,

GFA received over $15 million in donations specifically designated for "Bridge of Hope,"

but spent only $6.3 million on "child welfare."

### 2.    GFA misdirected money designated for Jesus Wells

33.    GFA represents that it constructs "Jesus Wells" to provide clean, potable

water to underserved villages in India. In 2012, GFA collected more than $3.5 million in

donations designated for Jesus Wells, but spent only $500,000 on that project. In 2013,

GFA collected more than $4 million in donations designated for Jesus Wells, but spent

only $700,000 on that project. Accepting GFA's representation that it is able to drill a

well for only $1,400,[15] in real terms, this discrepancy between donations received and

money spent in India means that in 2012 GFA received funding sufficient to establish at

least 2,500 wells, but its actual spending in India was sufficient to establish only 350

wells, while in 2013, GFA received funding for at least 2,800 wells, but only spent

enough in India for 500 wells.

### 3.    GFA misdirected money designated for orphans and widows

34.    Between 2010 and 2013, GFA collected more than $4.2 million dollars

designated by donors to support "Widows and Abandoned Children." During that time,

GFA, per disclosures on FC-6 forms, spent only $31,265 for the welfare of widows, and

---

[14] Warren Throckmorton, "How Much Does it Really Cost to Sponsor a Child with
Gospel for Asia?" posted May 27, 2015 at
http://www.patheos.com/blogs/warrenthrockmorton/2015/05/27/how-much-does-it-
really-cost-to-sponsor-a-child-with-gospel-for-asia/ (last accessed February 1, 2016).
[15] See http://www.gfa.org/ministries/jesuswells/ (last accessed February 1, 2016).

$0.00 for the welfare of orphans—less than 1% of what GFA collected for this purpose.



In South Asian culture, most widows are seen as a curse and shunned from society. Depending on the circumstances, they're often ignored by even their close relatives.

Abandoned children also face extremely difficult conditions. On their own, they search for food in waste dumps and make their homes with trash and rubble.

## Their Situation Can Improve

Your donation will provide Gospel for Asia-supported missionaries with the means to help these precious women and children of God.

*Solicitation of donations to support "Widows and Abandoned Children" from GFA.org (as it appeared on November 2, 2012). See https://web.archive.org/web/20121102031628/http://www.gfa.org/ministries/widows-abandoned-children/ (last accessed February 2, 2016).*

### C.   GFA diverts donated money to benefit itself and its affiliates

35.   GFA sends the majority of the donated funds it receives to Gospel for Asia – India and Believers Church. GFA represents that these Indian entities are wholly separate from GFA and not subject to the control of either GFA or K.P. Yohannan. GFA's website presents Believers Church as a "Field Partner" of GFA and, states there is "no legal binding [sic] between GFA and Believers Church."[16] In a video overview of Believers Church hosted on GFA's website, GFA identifies K.P. Yohannan solely as the "Founder of Gospel for Asia." The video is hosted at http://www.gfa.org/believerschurch/, and a screenshot from the video containing this identification is as follows:

---

[16] *See* "Once in a while, I hear about Believers Church through GFA. Is there any affiliation between GFA and Believers Church?" answered at http://www.gfa.org/about/faqs/ (last accessed February 1, 2016).



36.     K.P. Yohannan, however, also serves as the Metropolitan of Believers

Church (the position of highest and absolute authority within the organization, analogous

to the Pope of the Roman Catholic Church).



*Believers Church has eleven bishops, including Metropolitan Yohannan. See*
*http://www.believerschurch.com/about/bishops/ (last accessed February 2, 2016).*

37.     As Metropolitan, Yohannan knows of and provides input into every

significant decision affecting the finances of Believers Church. *See* Exhibit 1 hereto at p.6, item 10. Among the "Powers and Functions of the Metropolitan," as outlined in the 2009 Constitution of Believers Church, are:

- "The Metropolitan shall by the virtue of his office is [sic] the President and final authority for the Church government, including the Managing Trustee or President of all Trust and societies of the Believers Church and custodian of the Believers Church at large."
- "He has authority over the Church and all the establishments thereunder."
- "The Metropolitan shall have power to give directions to the Episcopa (Bishops) on all matters in regards to spiritual and general administration and life of the Church and can withdraw or modify any of such conferred powers."

> ## CHAPTER 2
> ## THE MINISTRY OF THE CHURCH
>
> ### THE METROPOLITAN BISHOP
>
> 1) The Metropolitan Bishop (hereinafter referred as the Metropolitan) shall be the supreme ecclesiastical and constitutional Head and final authority on all matters of the Believers Church under the Lordship of Jesus Christ, THE HEAD of the Church. The Metropolitan of the Church shall be constitutionally known and addressed, "His Grace The Most Reverend" with the name that is otherwise officially known.

*From the Believers Church 2009 Constitution. See*
*http://www.patheos.com/blogs/warrenthrockmorton/2015/10/20/believers-church-*
*constitution-contradicts-k-p-yohannans-claim-that-he-has-no-legal-authority-in-*
*indian-church/ (last accessed February 1, 2016).* [17]

---

[17] *See also* Believers Church's own reference to its Constitution at
http://www.believerschurch.com/about/ (last accessed February 1, 2016).

38.     Yohannan created Believers Church in 2003. From 2003 through 2014, GFA solicited and collected approximately $700,000,000 from U.S. donors. During this period, Believers Church bought and operated the following:

(1) a 2,300-acre for-profit rubber plantation, the Cheruvally Rubber Estate, in Kerala, India, shown in the following screenshot:



*From the Believers Church website. See http://www.believerschurch.com/cheruvally-estate/ (last accessed February 2, 2016).*

(2) Caarmel Engineering College, a for-profit undergraduate institute in Kerala, India, of which K.P. Yohannan is the "patron" as shown on the College's homepage as referenced in the following screenshot:



*From the Caarmel Engineering College homepage. See www.bccaarmel.ac.in (last accessed on February 2, 2016).*



*Believers Church Caarmel Engineering College in Kerala, India. See http://www.bccaarmel.ac.in/default.asp (last accessed February 5, 2016).*

(3) Believers Church Medical College Hospital, a for-profit, 500-bed teaching

hospital established in Kerala in 2014, of which K.P. Yohannan is the "patron," as shown

in the following screenshot:



*From the Believers Church Medical College Hospital homepage. See www.bcmch.org*
*(last accessed February 2, 2016).*



*Believers Church Medical College Hospital in Kerala, India. See http://www.bcmch.org*
*(last accessed February 5, 2016).*

(4) At least six for-profit primary schools in Kerala, India, for which K.P.

Yohannan is patron, shown in the following screenshot:



*From the Believers Church Residential School website. See www.bcrschool.org (last accessed February 2, 2016).*



*Believers Church Residential School in Kerala, India. See http://www.bcrschool.org/about/ (last accessed February 5, 2016).*

29

(5) Sponsorship of a football (soccer) club playing the Myanmar National League.

Here is the team badge:



*See http://www.datasportsgroup.com/images/clubs/200x200/11780.png*
*(last accessed February 3, 2016).*

39.     In 2010, GFA purchased land and began constructing a state-of-the-art, $45 million compound in Wills Point, Texas. GFA initially claimed, and presented as true through the financial documents of its auditing firm, that a $20 million anonymous donation was received for the development of the 350-acre plot of land on which the compound now sits, as the following excerpt shows:

> GOSPEL FOR ASIA, INC.
> NOTES TO FINANCIAL STATEMENTS
> December 31, 2013 and 2012
>
> NOTE J – CONCENTRATION OF CREDIT RISK
>
> GFA maintains its cash in bank deposit accounts which, at times, may exceed federally insured limits. At December 31, 2013, GFA's bank balances exceeded federally insured limits by $11,286,742. At December 31, 2012, GFA's bank balances did not exceed these federally insured limits. GFA has not experienced any losses in such accounts and believes it is not exposed to any significant credit risk on cash and cash equivalents.
>
> During 2013, GFA received a temporarily restricted contribution from an anonymous donor in the amount of $19,778,613 to be used for the construction of the new home office.

*Excerpt from a 2013 audit of GFA done by Dallas accountancy Bland Garvey. Exhibit 7*
*hereto.*

40.     In fact, the $20 million used to develop the land in Wills Point had come to GFA from GFA-India, on the direction of Believers Church. Specifically, that $20 million came from the cash reserves of GFA-India, which consisted of donations to GFA solicited under the promise of GFA's 100% to-the-field guarantee and subject to the designations of donors. Thus, money donated from the United States designated for specific charitable purposes in "the Field" in fact was spent in the United States to develop the Wills Point compound.

41.     GFA is now headquartered in a 350-acre compound, including a massive headquarters building, a multi-million dollar chapel, and 80+ single-family residences for members of the GFA religious order. Ironically, K.P. Yohannan once wrote about church construction in the United States (in his "Revolution in World Missions" book, at p. 47) thusly: "These extravagant [church] buildings are insanity from a Two-Thirds World perspective. The $74 million spent on one new building in the United States could build thousands of average-sized churches in South Asia. The same $74 million would be enough to guarantee that the Good News of Jesus Christ could be proclaimed to a whole Indian state—or even some of the smaller countries of Asia."



*GFA's new Headquarters building, designed by HH Architects. See*
*http://www.patheos.com/blogs/warrenthrockmorton/2015/08/28/question-for-gospel-for-*
*asia-how-many-indian-churches-would-45-million-build/ (last accessed February 2,*
*2016).*

## V. INDIVIDUAL ALLEGATIONS

42.    Plaintiffs Matthew and Jennifer Dickson made several donations to GFA over the course of several years. They made each such donation only after learning of GFA's guarantee that it would apply 100% of every donation exactly as the Dicksons designated.

43.    For example, in May of 2013, the Dicksons decided to donate $25 to GFA's "Widows and Abandoned Children" fund in honor of Matthew's mother as a Mother's Day present. The Dicksons viewed a webpage on GFA's website discussing the "Widows and Abandoned Children" fund.

In South Asian culture, most widows are seen as a curse and shunned from society. Depending on the circumstances, they're often ignored by even their close relatives.

Abandoned children also face extremely difficult conditions. On their own, they search for food in waste dumps and make their homes with trash and rubble.

## Their Situation Can Improve



Your donation will provide Gospel for Asia-supported missionaries with the means to help these precious women and children of God.

Your gift will also give them the chance to hear about their Creator and a Savior that loves them so much that he died for their sins.

## Know You Made a Difference

By giving to the widows and abandoned children of South Asia, you ensure that they're taken care of and shown love.

Continue this week knowing your action has truly made a difference.

Watch a video about a woman named Geeta. This video will help you better understand the plight of widows and children in South Asia.

## Give to Widows and Abandoned Children

*The webpage for the "Widows and Abandoned Children" fund at GFA.org (as it appeared on May 14, 2013). See* https://web.archive.org/web/20130514142252/http://www.gfa.org/ministries/widows-abandoned-children/ *(last accessed February 2, 2016).*

44.     On May 12, 2013, with the understanding that GFA would apply 100% of their $25 donation to the "Widows and Abandoned Children" fund in the Field, the Dicksons made the donation through GFA's website. GFA provided the Dicksons with a receipt (Exhibit 4 hereto) reciting the GFA 100% guarantee and noting that the $25 donation was designated to the "Widows and Abandoned Children" fund.

| Account Activity January 01, 2013 - December 31, 2013 | | | |
|---|---|---|---|
| **Date** | **Code** | **Description** | **Amount** |
| Summary | 4000 | 24 National Missionary gifts | $720.00 |
| Summary | 1038107158 | 36 Bridge of Hope gifts | $1,008.00 |
| 05/12/2013 | 4030 | Widows and Abandoned Children | $25.00 |

*The Dicksons' 2013 Annual Receipt documenting their gift to GFA's "Widows and Abandoned Children" fund in honor of Matthew's mother on Mother's Day. Exhibit 4 hereto.*



*The 2013 Annual Receipt the Dicksons received from GFA, bearing the GFA 100% Guarantee, a statement that GFA is "committed to apply your gifts according to your preferences," and the ECFA and ICA seals of approval and assurances thereby (valid at the time this receipt was issued). Exhibit 4 hereto.*

45.     Every single donation the Dicksons made to GFA was made only with the understanding, based entirely on Defendants' representations, that 100% of the donation would be applied exactly as designated by the Dicksons. As detailed above, however, Defendants misdirected money the Dicksons donated to GFA to purposes the Dicksons did not designate. Had the Dicksons known that Defendants would not apply 100% of every donation exactly as they designated, they would not have donated to GFA.

## VI. CLASS ALLEGATIONS

46.     Plaintiffs seek to represent the following Class:

All persons in the United States who donated money to GFA within the applicable statutes of limitations. Excluded from the Class are Defendants and their subsidiaries and affiliates; all persons who make a timely election to be excluded from the Class; governmental entities; and the Judge to whom this case is assigned and his/her immediate family.

Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

47.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

48.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

49.     Numerosity. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are not less than tens of thousands of members of the Class, the precise number of Class members is unknown to Plaintiffs, but may be ascertained from Defendants' books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

50.     Commonality and Predominance. Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a) Whether Defendants engaged in the conduct alleged herein;

b) Whether Defendants' conduct violates RICO, consumer protection statutes, and other laws as asserted herein;

c) Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief; and

d) Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

51.     Typicality. Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through Defendants' wrongful conduct as described above.

52.     Adequacy. Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Class they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

53.     Declaratory and Injunctive Relief. Federal Rule of Civil Procedure 23(b)(2): Defendants have acted or refused to act on grounds generally applicable to

Plaintiffs and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

54.     Superiority. Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I
## VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
## 18 U.S.C. §§ 1961-1968

55.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

56.     Defendant Gospel for Asia, Inc. is an enterprise engaged in and whose activities affect interstate commerce. Defendants Gospel for Asia-International, K.P. Yohannan, Gisela Punnose, Daniel Punnose, Carroll, and Emerick are employed by or

associated with the enterprise.

57.      As described in detail in the factual allegations above, Defendants agreed
to and did conduct and participate in the conduct of the enterprise's affairs through a
pattern of racketeering activity and for the unlawful purpose of intentionally defrauding
Plaintiffs and the Class. Defendants intentionally made materially false representations to
Plaintiffs and the members of the Class that resulted in their contributions of money for
charitable purposes to their detriment.

58.      Pursuant to and in furtherance of the fraudulent scheme, on multiple,
continuous occasions over the course of several years, Defendants used the United States
mails, the internet, radio, and made multiple interstate telephone calls to solicit Plaintiffs
and the other members of the Class, and to receive contributions of money from Plaintiffs
and the other members of the Class.

59.      Defendants have therefore committed multiple instances of mail fraud
under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343, continuously over the
course of several years.

60.      These acts, as described in detail in the factual allegations above,
constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5). Defendants,
through the above-described acts, directly and indirectly conducted and participated in
the conduct of the enterprise's affairs through the pattern of racketeering activity, in
violation of 18 U.S.C. § 1962(c). Defendants' practices and commissions of mail fraud
are all related, as described in detail above, extend over a substantial period of time
spanning several years, and pose a threat of continued unlawful and criminal activity.

61.      As a direct and proximate result of Defendants' racketeering activities and

violations of 18 U.S.C. § 1962(c), Plaintiffs and the members of the Class have been injured in their business and property in the amounts of the monies they donated, and the Defendants are liable to Plaintiffs and the members of the Class, jointly and severally, for all actual damage caused in an amount to be proved at trial, trebled pursuant to 18 U.S.C. § 1964(c).

## COUNT II
## FRAUD

62.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

63.     As described in detail in the factual allegations above, Defendants made false representations to Plaintiffs and the members of the Class that contributions solicited for charitable purposes shall be spent in a specific manner or for specified purposes. Defendants intentionally denied Plaintiffs and the other Class members information that is highly relevant to their decision to contribute money for charitable purposes, in particular the material information that significant portions of each contribution would not be spent by Defendants as specified by Plaintiffs and the other Class members. If Defendants had fully disclosed to Plaintiffs and the Class that their contributions would not be spent as they specified, Plaintiffs and the members of the Class would not have made the contributions.

64.     Defendants knew their representations were false when made.

65.     Defendants intentionally made the false representations in order to induce Plaintiffs and the members of the Class to contribute money, and Plaintiffs and the members of the Class reasonably contributed money as a result.

66.     Plaintiffs and the other Class members have as a result been injured in an amount to be proved at trial.

67.     Defendants' conduct was knowing, intentional, demonstrated a complete lack of care, or was in reckless disregard for the rights of Plaintiff and the other Class members.

68.     Plaintiff and the other Class members are therefore entitled to an award of punitive damages.

## COUNT III
## VIOLATIONS OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT
### Ark. Code Ann. §§ 4-88-101, *et seq.*

69.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

70.     Plaintiffs have standing to pursue this claim under Ark. Code Ann. § 4-88-113(f).

71.     As described in detail in the factual allegations above, Defendants made false representations to Plaintiffs and the members of the Class that contributions solicited for charitable purposes shall be spent in a specific manner or for specified purposes, in direct violation of Ark. Code Ann. § 4-88-107(a)(7).

72.     Defendants' false representations were materially misleading to Plaintiffs and the Class in that they resulted in Plaintiffs and the Class contributing money that they otherwise would not have contributed.

73.     As a direct result of Defendants' false representations, Plaintiffs and the Class have been injured by the Defendants, jointly and severally, in an amount to be

40

proved at trial.

## COUNT IV
## UNJUST ENRICHMENT

74.     Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

75.     As described in detail in the factual allegations above, Defendants intentionally made materially false representations to Plaintiffs and the members of the Class that resulted in their contributions of money for charitable purposes to their detriment.

76.     Under these circumstances as described in detail above, Defendants have received money from Plaintiffs and the members of the Class that Defendants, in equity and good conscience, ought not retain.

77.     As a result, Defendants are liable in restitution to Plaintiffs and the members of the Class to disgorge and remit to Plaintiffs and the Class all monies contributed, in an amount to be proved at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against Defendants, as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B. An order temporarily and permanently enjoining Defendants from continuing

the unlawful, deceptive, fraudulent, and unfair practices alleged in this

Complaint;

C. Costs, restitution, damages, including punitive damages, and disgorgement in

an amount to be determined at trial;

D. An order requiring Defendants to pay both pre- and post-judgment interest on

any amounts awarded;

E. An award of costs and attorneys' fees; and

F. Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial.

DATED this __ day of February, 2016.    Respectfully submitted,

_____
Woodson W. Bassett III
Arkansas Bar No. 77006
wbassett@bassettlawfirm.com
James Graves
Arkansas Bar No. 95172
jgraves@bassettlawfirm.com
**BASSETT LAW FIRM LLP**
221 North College Avenue
P.O. Box 3618
Fayetteville, Arkansas 72702
479.521.9996
479.521.9600 (fax)

Marc R. Stanley (*pro hac vice* forthcoming)
marcstanley@mac.com
Martin Woodward (*pro hac vice* forthcoming)
mwoodward@stanleylawgroup.com
**STANLEY LAW GROUP**
6116 N. Central Expressway, Suite 1500
Dallas, Texas 75206
214.443.4300
214.443.0358 (fax)

Tom Mills (*pro hac vice* forthcoming)
tmills@millsandwilliams.com
**MILLS AND WILLIAMS, LLP**
5910 N. Central Expressway, Suite 980
DALLAS, TEXAS 75206
214.265.9265
214.361.3167 (FAX)

*Counsel for Plaintiffs and the Class*